# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**CARLOS RIVERA**,
    Petitioner,

v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 18-1456 (BJM)

## <u>OPINION AND ORDER</u>

Carlos Rivera ("Rivera") moves to reverse the Commissioner of the Social Security Administration's ("the SSA's") decision to redetermine and terminate his Social Security Disability Insurance benefits ("SSDI"). Dkt. 31. The SSA defended its decision. Dkt. 36. The case is before me by consent of the parties. Dkt. 7.

For the following reasons, the SSA's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

The court's review of Social Security disability cases is limited to determining whether the Commissioner employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."). The

court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987). After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 42 U.S.C. § 405(g).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, the adjudicator must consider all evidence in the record. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed disabled. If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity

("RFC") and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform that work, the fifth and final step asks whether the claimant can perform other work available in the national economy given his RFC, age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant meets this burden, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz*, 890 F.2d at 524. Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

Rather than requesting review of an initial determination, Rivera appeals a redetermination. "The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits." 42 U.S.C. § 405(u)(1)(A). The SSA may have reason to believe fraud or similar fault occurred through its own investigations or through referral of an investigation by the Office of the Inspector General ("OIG"). *See, e.g.*, 42 U.S.C. § 1320a–8(l). "Similar fault" exists when either "an incorrect or incomplete statement that is material to the determination is knowingly made" or "information that is material to the determination is knowingly concealed." *Id.* § 405(u)(2). "When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." 42 U.S.C. § 405(u)(1)(B).

The Appeals Council, which issues the final administrative determination on social security cases, defines its procedures and guiding principles in the Hearings, Appeals and Litigation Law manual ("HALLEX").[1] HALLEX states that a redetermination "based on fraud or similar fault is a re-adjudication of the individual's application for benefits." HALLEX I-1-3-25(A) (updated Feb. 25, 2016). The ALJ charged with redetermining a claim may consider evidence initially submitted as well as new, material evidence that does not involve fraud or similar fault and is related to the period at issue. *Id.* An ALJ generally decides "whether to disregard evidence based solely on whether there is reason to believe similar fault was involved," but an ALJ assigned to redetermine a claim may also be instructed to disregard certain evidence. *Id.* at I-2-10-10(A), Note 1 (updated June 25, 2014). Evidence to be considered can be divided between initial evidence, submitted for the original claim, and new evidence that a beneficiary may submit for the redetermination. Pursuant to § 405(u)(2), the adjudicator *must* disregard any information from an OIG referral which resulted in a finding of fraud or similar fault. *See id.* at I-1-3-25(C)(4)(a). "[A]djudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded when based on an OIG referral of information." *Id.*; *see also* SSR 16-1p, 81 Fed. Reg 13436 (March 14, 2016). Redeterminations based on SSA findings of fraud or similar fault, however, are treated differently, and adjudicators retain discretion to consider the beneficiary's objection to disregarding certain evidence. HALLEX I-1-3-25(C)(4)(a). A beneficiary may submit additional evidence if it is "new, material, and related to the time period at issue." *Id.* at I-1-3-25(C)(4)(c). The time period at issue in a redetermination runs from the disability onset date through the date of the final benefits determination. *Id.* at I-1-3-25(C)(3). The onset date is the date determined by the SSA, rather than the date declared by the beneficiary on his initial application for benefits. "Evidence that post-dates the original determination or decision can relate to the period at issue if it is reasonably related to the time period originally adjudicated." *Id.* at I-1-3-

---

[1] HALLEX, the Hearings, Appeals and Litigation Law manual, can be located online at https://www.ssa.gov/OP_Home/hallex/hallex.html.

25(C)(4)(c). The adjudicator then determines, based on the eligible evidence, whether the beneficiary was or was not entitled to benefits at the time of the original determination.

Should the Commissioner determine "that there is insufficient evidence to support such entitlement, the Commissioner of Social Security may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments." 42 U.S.C. § 405(u)(3).

## BACKGROUND

Rivera was born on December 18, 1977. Tr. 313. For work, he operated a large dump truck and later repaired and stacked wooden pallets. Tr. 34-35, 43. After injuring his back and neck in a workplace accident, he stopped working. Tr. 36. He also developed anxiety and depression. Tr. 37.

Rivera applied for disability benefits on October 20, 2010, claiming February 9, 2010 as his onset date. Tr. 313, 323. His initial application was based on physical limitations related to neck pain, back pain, and head trauma. Tr. 326.

On January 11, 2011, the SSA referred Rivera to Dr. Hector-Cases Mayoral ("Dr. Cases") for a consultative examination. Tr. 460. The agency asked Dr. Cases, a neurologist, to conduct a neurological evaluation and provide his opinion about what Rivera could do with regard to "sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, traveling. etc." Tr. 460. On March 7, Dr. Cases completed an exam assessing various physical limitations and noting that Rivera was alert, cooperative, and well-oriented. Tr. 453.

The SSA denied Rivera's initial claim on April 25, 2011. Tr. 52. He sought reconsideration, this time alleging both mental and physical impairments. Tr. 58-59. Included in his application on reconsideration was evidence from Dr. Rafael Miguez Balseiro ("Dr. Miguez"), a psychiatrist who opined that Rivera's depression and related limitations were severe. Tr. 61, 501-07.

On September 16, 2011, Dr. Miguez completed a disability report in which he stated that Rivera suffered from "major depressive disorder recurrent of a severe intensity." Tr. 501. According to Dr. Miguez, Rivera first sought treatment on December 1, 2010 and continued seeing Dr. Miguez at six-week intervals for psychotherapy. Tr. 501. Dr. Miguez prescribed Risperdal for impulse control, Klonopin for anxiety, Dalamne for insomnia, and Paxil for depression. Tr. 501.

He explained that Rivera was "irritable, tense, depressed, with lack of motivation in life, insomnia, feeling of hopelessness . . . and no interest on [sic] things he liked to do before." Tr. 501. He described Rivera's ability to understand and follow instructions as poor; his social interaction as "very poor"; his speech as disorganized; his thought production as fair; his memory, attention, and concentration as limited; and his judgment as impulsive and erratic. Tr. 502-505. He opined that Rivera suffered from severe depression and great anxiety, could not manage stress, could not handle changes in routine, that he needed to be supervised by immediate family members, and that his "social, work, interpersonal, and family performances [we]re severely affected limiting him totally to work." Tr. 502-06. Dr. Miguez concluded that Rivera's prognosis was poor because he had not responded well to treatment and stated that he did not expect significant changes in the coming years. Tr. 502, 505.

Also included in his application were Rivera's self-reports. In a function report dated December 13, 2010, Rivera stated that he could no longer work, sleep, or do things by himself. Tr. 341. He lived at home with his companion and son, who helped him with food preparation and household tasks. Tr. 341-42. During the day, he would watch television, go outside for air, take medications, and sleep. Tr. 340. He could go out alone, drive a car, go shopping for food and medications in stores, pay his bills, count change, and handle a savings account, but he needed reminders to help him take the correct amount of medicine. Tr. 342-43. Rivera regularly went to doctors' appointments but needed reminders and someone to accompany him. Tr. 344. Although he reported that he spent time with others to get things off his chest, he also reported having problems getting along with others because he did not like to talk much and no longer enjoyed going out. Tr. 344-45. He had no trouble, however, getting along with authority figures. Tr. 346. Rivera also stated that he felt everything was difficult, that he felt discouraged with a lack of interest, that he suffered from anger and anxiety, and that he had little desire to do anything. Tr. 345. Additionally, he reported that he could not pay attention for long, he could not finish what he started, he followed instructions poorly, he did not handle stress well, and he did not handle changes in routine well. Tr. 346. He also felt nervous and fearful and suffered from nightmares. Tr.

341, 346. In a form item asking Rivera about his personal care, he wrote "N/A." Tr. 341. Although the form included a box Rivera could check if he had "NO PROBLEM with personal care," Rivera did not check that box. Tr. 341 (emphasis in original).

Rivera completed another questionnaire on August 8, 2011. Tr. 388. He reported that his ability to think and concentrate had been affected by his pain, and he spent all his time lying down because of strong pain. Tr. 395. He could sometimes take care of his daily needs, but his wife helped him with personal care, including by bathing him and helping him put on his pants. Tr. 395, 398. His daily activities included watching television, walking around the house, and laying down. Tr. 395. While watching television, he would struggle to concentrate and lose interest. Tr. 401. He had trouble sleeping. Tr. 398. Rivera's wife prepared his meals, gave him his medications, and managed the finances because of Rivera's forgetfulness. Tr. 397, 399, 400. He performed no household chores and no longer went shopping. Tr. 399. Others drove Rivera places, and he required accompaniment outside his home. Tr. 399-400. He did not receive visits from family and friends, he was not interested in social activities, and pain prevented him from attending social functions. Tr. 401-02. Rivera also reported that he did not like changes in routine, could not concentrate, and would forget everything. Tr. 402.

On October 3, 2011, state agency psychological consultant Dr. E. Charles reviewed the record, including evidence from Dr. Miguez. Tr. 508-25. Dr. Charles described Rivera's allegations as "credible" and found that his mental limitations were impeding Rivera's capacity for sustained substantial gainful activity. Tr. 510. Dr. Charles determined that Rivera suffered from various mental limitations, including marked difficulties in social functioning. Tr. 508-25. Based on these limitations, the SSA found Rivera disabled and began paying him disability benefits. Tr. 53, 86.

Meanwhile, the SSA's OIG, the Department of Justice ("DOJ"), and the Federal Bureau of Investigation ("FBI") were investigating alleged SSDI fraud. *See generally* Ex. 14B. They were investigating a non-attorney representative and various doctors, including Dr. Miguez, alleged to be involved in a fraudulent scheme to obtain SSDI benefits. That investigation led to various indictments.

Among those indicted was a neurologist named Dr. José Hernández-Gonzalez who ultimately pled guilty to conspiracy to make false statements to the SSA. Tr. 123. "Dr. Hernández Gonzalez admitted that he would exaggerate medical complaints and symptoms in order to maximize the probability that his patients would be approved for Social Security disability insurance benefits." *Id.* He also admitted to referring patients to doctors who would "exaggerate or fabricate the patients' conditions to strengthen the patients' disability applications." *Id.* Rivera's psychiatrist, Dr. Miguez, was one of those physicians. *Id.*

According to OIG, from January to February 2012, Dr. Miguez treated a "putative patient" who was in good health and suffered from no disabling conditions. Tr. 121. Nonetheless, Dr. Miguez filled out a psychiatric medical report stating that this patient suffered "from recurrent and severe depressive disorder, accompanied by anxiety, that this patient was experiencing crying spells, that this patient's body and mind were slow, that this patient had problems concentrating, and that this patient suffered from feelings of inadequacy, desperation, felt useless and worthless, and was suicidal." Tr. 121.

On August 16, 2013, Dr. Miguez was indicted for making false statements to the SSA. Tr. 168. In response to this and other indictments, the SSA assembled a team of adjudicators, the New York Fraud Prevention Unit ("FPU"), that would conduct redeterminations of claims involving evidence from indicted sources. Dkt. 36 at 6. These adjudicators evaluated the claims to determine whether they could continue to support benefits in the absence of evidence from an indicted source. *Id.* They determined that 2,000 SSDI beneficiaries could no longer support their claims. *Id.*

Rivera was among these claimants. The SSA disregarded evidence from Dr. Miguez and found that Rivera no longer qualified for disability benefits because his application was otherwise devoid of detailed psychological medical evidence. Tr. 527. On December 6, 2013, the SSA informed Rivera that it would be suspending his benefits because it believed fraud or similar fault was involved in evidence supporting his claim. Tr. 92. The letter explained that various doctors, including Dr. Miguez, had been indicted for making false statements to the SSA, and that the agency would be suspending Rivera's benefits while it redetermined his claim. Tr. 92. The SSA

informed Rivera that he had ten days to respond if he believed the information in the letter was incorrect. Tr. 92.

Rivera submitted additional evidence, all of which post-dated the period the SSA would consider. Dkt. 36 at 7. The SSA again disregarded evidence from Dr. Miguez, who was deemed a "discredited medical source," and again found that Rivera was not disabled, as no medical evidence supported his allegations of depression. Tr. 54. In a notice dated January 7, 2014, the SSA informed Rivera that it had redetermined his case, having disregarded evidence from Dr. Miguez, and concluded that he was not disabled. Tr. 95-97.

Rivera requested reconsideration, and the SSA informed Rivera that he could submit additional evidence, so long as it related to the period from February 9, 2010 to October 16, 2011, and so long as it was not from Dr. Miguez. Tr. 101-03. On reconsideration, the SSA again disregarded all evidence from Dr. Miguez, who was "discredited," and again found that Rivera was not disabled. Tr. 65-67. On June 30, 2014, the SSA informed Rivera that his claim was denied, and that he had been overpaid $34,672. Tr. 104. On July 8, Rivera requested a hearing before an ALJ. Tr. 111.

In the meantime, proceedings against Dr. Miguez continued. On September 24, 2014, Dr. Miguez pled guilty to a one-count Information. Tr. 188. He admitted to failing to maintain a cash ledger of monies paid in connection with SSA medical visits and for a medical report filed with the SSA without intent to defraud the United States. Tr. 195. The charges against Dr. Miguez were dismissed with prejudice. Tr. 187.

On June 19, 2015, OIG provided the SSA with a memorandum summarizing the results of their fraud investigation, including their investigation of Dr. Miguez. Tr. 121-23. In response, the SSA decided it would remand 903 cases where there was a request for a hearing and review the redetermination decision. Dkt. 36 at 8.  Rivera's was one of these cases.

Thus, in October 2015, the FPU again examined Rivera's claim. Tr. 70-73. In a "special determination," an adjudicator examined the report prepared by Dr. Miguez. Tr. 71. (Rivera had not yet provided treatment notes from Dr. Miguez.) The adjudicator determined that fraud or

similar fault was involved in the report from Dr. Miguez. In reaching this conclusion, she explained that she found the report inconsistent with other portions of the record and determined that the report "fits the pattern found in the OIG investigation." Tr. 73.  She also noted that Rivera was capable of calling the SSA to inquire about the status of his claim, requested time to submit new evidence, and had been his own payee since being awarded disability benefits. *Id.* According to the adjudicator, these facts indicated that Rivera was capable of some level of "competency and understanding." *Id.* On this "informal remand," the SSA again found Rivera not disabled. Tr. 74.

In a letter dated December 28, 2016, the SSA provided Rivera with details regarding his upcoming hearing before an ALJ. Tr. 228-31. That letter informed Rivera that evidence from Dr. Miguez would be reviewed under the SSA's fraud and similar fault rules and that Rivera could present his case to the ALJ. *Id.* In a separate letter informing Rivera of his hearing date, the SSA again informed Rivera that it would assess evidence from Dr. Miguez under the SSA's fraud or similar fault rules. Tr. 262.

Rivera, represented by an attorney, appeared before an ALJ on August 7, 2017. Tr. 32. He testified that, before a workplace accident, he had worked as a truck driver operating a large dump truck and then for the Coca Cola company repairing and stacking wooden pallets. Tr. 34-35, 43. One day, after repairing a pallet, he tried to lift it to place it on top of a pile of pallets. Tr. 36.  As he was lifting, his entire back locked up and he had to throw the pallet aside. Tr. 36. The accident affected his back and neck. Tr. 36. After his injury, he could no longer work, and he began experiencing anxiety, depression, sleeplessness, desperation, and anger. Tr. 37-38. Rivera testified that his partner asked him to see Dr. Miguez because of his mental condition. Tr. 37. Sessions with Dr. Miguez lasted from an hour to an hour and half. Tr. 38. During those sessions, Dr. Miguez would ask Rivera questions and prescribe medication. Tr. 38. From 2010 to 2011, Rivera described his daily routine as follows: "I would get up and take the medication, go outside, get some air and then go back to the house." Tr. 38. He also testified to experiencing pain all the time, the intensity of which varied. Tr. 38. He explained that from February 2010 to October 2011 he could stay sitting down for no more than two hours, could stand for less than an hour, and could walk for

about five minutes. Tr. 39. On days where the pain was the worst, he would lie down for two to three hours. Tr. 39. For entertainment, he would watch television, and he needed to be reminded to take medications. Tr. 40. He testified that he was still taking medication, including Restoril, Temazepam, Axel, Klonopin, and Neurontin. Tr. 41. These medications were prescribed for depression, anxiety, pain, and to help Rivera sleep. Tr. 41.

The ALJ issued a written decision on January 31, 2018, finding that Rivera was not disabled at any time from February 9, 2010, through October 4, 2011, the date of the prior disability determination. Tr. 15, 24. The ALJ began by assessing the evidence from Dr. Miguez. He found that Dr. Miguez's opinion was inconsistent with Rivera's self-reports, that treatment notes failed to corroborate the opinion, and that the opinion conflicted with the findings of a neurological exam. Tr. 17-18. He also concluded that pharmacy records were inconsistent with evidence from Dr. Miguez because the dates of prescription refills only twice aligned with the dates of visits to Dr. Miguez and because the amount prescribed would have left Rivera "with either more or less than needed at each treatment interval." Tr. 18. The ALJ also noted that Rivera was his own payee and could manage his own benefits after separating from his wife, and he referenced the agency special determination finding that the evidence from Dr. Miguez "fit the pattern established in other fraud determinations." Tr. 19. Ultimately, the ALJ determined he would disregard evidence from Dr. Miguez. Tr. 19.

The ALJ then proceeded to the five-step analysis required to determine eligibility for disability benefits. At step one, the ALJ found that Rivera did not engage in substantial gainful activity during the relevant period. Tr. 19. At step two, he found that Rivera suffered from severe degenerative disc disease. Tr. 19. At step three, he concluded that Rivera's degenerative disc disease did not meet or equal the severity of a listed impairment. Tr. 20. The ALJ then found that Rivera had the RFC to perform light work, except that he could stand and/or walk for up to four hours in an eight-hour workday; sit for up to six hours; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, kneel, or crawl; and occasionally stoop and crouch. Tr. 20. The ALJ found that Rivera's degenerative disc disease could reasonably be

expected to cause his alleged symptoms but that Rivera's statements concerning the intensity, persistence, and limiting effects of those symptoms were not consistent with other record evidence. Tr. 21. He noted that, at a neurological evaluation with Dr. Cases, Rivera could sit, stand, walk, lie down, and get up. Tr. 21. He also gave great weight to the opinions of three medical consultants regarding Rivera's functional limitations, finding that they came to the same conclusions regarding Rivera's capacities. Tr. 21. He also explained that, without the disregarded evidence from Dr. Miguez, there was no objective evidence to support any mental limitation. Tr. 22. The ALJ concluded that, although Rivera could not perform his past relevant work, there were jobs that exist in significant numbers in the national economy that he can perform. For instance, Rivera could work as a stock clerk, mail clerk, or counter clerk. Tr. 22-23.

The Appeals Council denied Rivera's request for review, making the ALJ's decision the SSA's final decision. Tr. 1. This action followed.

## DISCUSSION

Rivera contends that the ALJ's decision was not supported by substantial evidence and that the SSA's procedures violated both the Administrative Procedure Act and Due Process Clause of the Fifth Amendment. The SSA disagrees.

Typically, district courts review disability determinations to assess whether substantial evidence supports the SSA's decision. 42 U.S.C. § 405(g). Here, Rivera raises additional procedural questions, including a constitutional challenge. I will begin by addressing alleged errors by the ALJ and then address procedural challenges in keeping with the constitutional avoidance doctrine. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Vaqueria Tres Monjitas, Inc. v. Pagan*, 748 F.3d 21, 26 (1st Cir. 2014) ("[F]ederal courts are not to reach constitutional issues where alternative grounds for resolution are available.") (internal quotations and citation omitted). Should the SSA lack substantial evidence supporting its decision to deny Rivera's claim, then the court need not reach the constitutional question. If, however, substantial evidence supports the SSA's decision, then I must address the procedure by which that evidence was submitted and considered.

Rivera contends that the SSA's decision cannot stand because of various flaws in the ALJ's determination to disregard evidence from Dr. Miguez. The SSA maintains that the ALJ was justified in disregarding evidence from Dr. Miguez because he properly found that similar fault was involved in the providing of that evidence.[2] As explained below, the ALJ here failed to apply the appropriate law in assessing evidence from Dr. Miguez.

When redetermining a claimant's entitlement to benefits, an ALJ must disregard evidence if there is reason to believe that fraud or similar fault was involved in providing that evidence. 42 U.S.C. § 405(u)(1)(B). Similar fault is involved where "an incorrect or incomplete statement that is material to the determination is knowingly made or information that is material to the determination is knowingly concealed." 42 U.S.C. § 405(u)(1)(B). "A finding of similar fault can be made only if there is reason to believe that, based on a preponderance of the evidence, the person committing the fault knew that the evidence provided was false or incomplete. [The SSA] cannot base a finding of similar fault on speculation or suspicion." SSR 16-2p, 81 Fed. Reg. 13440 (March 14, 2016). To make a similar fault finding, an adjudicator must consider all evidence in the record, apply the preponderance of evidence standard, and "fully document the record with the evidence that was the basis for the finding." *Id.*

The SSA argues that the ALJ properly found that evidence from Dr. Miguez involved similar fault because that evidence conflicts with other portions of the record, Rivera did not allege a mental impairment in his initial application, pharmacy records cast doubt on the accuracy of Dr. Miguez's records, and the ALJ relied on the SSA's special determination. This argument is unavailing.

There is a straightforward shortcoming with regard to the ALJ's similar fault analysis: he failed to apply the plain language governing fraud and similar fault determinations because he made no findings regarding whether incomplete or inaccurate information was submitted *knowingly*. Congress plainly requires that similar fault only be found where it was committed

---

[2] The SSA argues only that the ALJ made a finding of similar fault, so I do not address whether this was a case involving "fraud." *See* Dkt. 36 at 15.

knowingly. 42 U.S.C. § 405 (u)(B)(2) ("[S]imilar fault is involved with respect to a determination if an incorrect or incomplete statement that is material to the determination is *knowingly* made or information that is material to the determination is *knowingly* concealed.") (emphasis added). And the SSA took pains to define the term "knowingly" for its adjudicators. SSR 16-2p, 81 Fed. Reg. 13440 (defining "knowingly" as "a person's awareness or understanding regarding the correctness or completeness of the information he or she provides us, or the materiality of the information he or she conceals from us"). In its Program Operations Manual System ("POMS"), the SSA illustrates "similar fault" by discussing a situation where a claimant fails to report in her initial disability application that she worked for a second employer. POMS § GN 04020.010(C).[3] When the SSA learned years later that she had worked at said business, she was able to furnish details about that employment. *Id*. The SSA considers it reasonable to conclude that such a claimant *knew* she worked for that employer and that she knew she should have reported her employment because she was specifically asked about employment on the benefits application. *Id.*; *see also Marshall v. Chater*, 75 F.3d 1421, 1424, 1427 (10th Cir. 1996) (upholding fraud or similar fault finding where a claimant repeatedly underreported his earnings and reported working only part-time and seasonally when he was actually working full-time and year-round); *Heins v. Shalala*, 22 F.3d 157, 160 (7th Cir. 1994) (finding fraud or similar fault where claimant had remarried but did not disclose that fact); *id.* at 162 ("Norma Jean does not and cannot claim that she did not know of her marriage to Robert Roberts.").

    In contrast, here it is not clear that Rivera knew he provided any false or incomplete evidence. Even assuming Dr. Miguez's descriptions of Rivera's mental impairment were inconsistent with other portions of the record,[4] such a finding does not establish that Rivera *knew* he had provided incorrect information. Indeed, resolving inconsistencies in the record is the ALJ's bread and butter. *See also Irlanda Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765,

---

[3] POMS, the Program Operations Manual System, can be located online at https://secure.ssa.gov/apps10/poms.nsf/partlist!OpenView.

[4] As explained below, various portions of the record the ALJ deemed "inconsistent" with evidence from Dr. Miguez were in fact consistent with that evidence.

769 (1st Cir. 1991) ("[T]he resolution of conflicts in the evidence is for the Secretary, not the courts."). Were inconsistent evidence sufficient to demonstrate that similar fault was involved in an application, the chances of anyone ever receiving disability benefits would be slim to none.

Nor do the ALJ's statements regarding the pharmacy records support a similar fault finding. The ALJ concluded that pharmacy records cast doubt on Rivera's treatment with Dr. Miguez because the dates of prescription refills fail to align with the dates of visits to Dr. Miguez. Having reviewed the entire transcript, I find no support for this conclusion. The only pharmacy records indicate that Rivera filled prescriptions from Dr. Miguez on December 1, 2010 and January 18, 2011. Tr. 423-24. These are the same dates on which Dr. Miguez's treatment notes indicate that Rivera sought treatment. The ALJ also found that the amount prescribed would have left Rivera "with either more or less than needed at each treatment interval." Tr. 18. Records indicate that Rivera filled prescriptions for fifteen Temazepame capsules, thirty Fluoxetine capsules, thirty Trazodone tablets, and sixty Lorazepam tablets. Tr. 423-24. As the record does not indicate how many tablets per day Rivera was instructed to take, I cannot say that Rivera was given either too many or too few pills.

Nor does the fact that Rivera initially claimed disability based solely on physical impairments show that he later knowingly submitted false information from Dr. Miguez. Indeed, the SSA permits claimants to allege new conditions on reconsideration and acknowledges that impairments may worsen over time. *See* 20 C.F.R. § 404.913(a) (permitting submission of new evidence on reconsideration); POMS § DI 27001.001(E) (providing guidance to adjudicators on reconsideration where claims involve "new allegations or a worsening of the claimant's condition").

Nor does the fact that Rivera served as his own payee show that he knowingly submitted incorrect or incomplete information. The SSA's records indicate that disability payments were made to Rivera. The transcript contains no other information demonstrating that Rivera managed this money himself. The SSA's determination that he managed this money himself appears to be nothing more than speculation, rather than a fact supported by substantial evidence in the record.

Finally, the fact that the ALJ cited to the SSA's special determination in deciding to disregard the evidence from Dr. Miguez does not permit finding by a preponderance of the evidence that Rivera knowingly submitted incorrect information. Like the ALJ, the FPU adjudicator found Dr. Miguez's evaluation inconsistent with other portions of the record. She also determined that Dr. Miguez's report "fit[] the pattern found in the OIG investigation." Tr. 73. But neither she nor the ALJ explained why the evidence in Rivera's case "fit that pattern."

In describing the investigation, the FPU adjudicator stated that a confidential FBI source went to Dr. Hernández's office and his receptionist offered the source six names of psychiatrists that the source could see, including Dr. Miguez. Tr. 71. The source went to Dr. Miguez's office, told him s/he was referred by Dr. Hernández, and that s/he was in financial difficulties and looking to earn money. *Id.* Dr. Miguez wrote a prescription to reduce stress without discussing stress with the source and told the source to schedule another appointment with Dr. Miguez's secretary. *Id.* The secretary asked the source whether his or her Social Security papers were ready. *Id.* The source visited Dr. Miguez's office approximately seven times, but only saw Dr. Miguez twice. *Id.*

In contrast, Rivera testified that his partner asked him to see Dr. Miguez because he was experiencing anger, desperation, and sleeplessness. Tr. 37. He stated that sessions with Dr. Miguez lasted from an hour to an hour and a half and that during those sessions, Dr. Miguez would ask Rivera questions and prescribe medication. Tr. 38. I struggle to see how those facts align with OIG's investigation, and the ALJ did not state that he found this testimony unbelievable. The only commonality I see between Rivera's case and the OIG investigation is that Dr. Miguez was the psychiatrist involved. But the mere fact that Dr. Miguez was Rivera's psychiatrist is not sufficient to show that Rivera knowingly submitted false information to the SSA. Were that the case, all of the similar fault findings involving Dr. Miguez where the SSA purports to be conducting an "informal remand" would be purely pro forma.

Ultimately, I cannot say that the ALJ properly applied the law governing similar fault determinations because he made no findings as to whether anyone *knowingly* submitted incorrect or incomplete information. Indeed, I am left to wonder whether the ALJ believed that it was Dr.

Miguez, Rivera, or both who knowingly submitted incorrect information. Although I do not intimate that the inconsistencies the ALJ named are altogether irrelevant to a similar fault finding, I must conclude that these inconsistencies, even alongside the ALJ's other stated reasons for disregarding the evidence from Dr. Miguez, do not permit a finding that Rivera knowingly submitted incorrect or incomplete information to the SSA. Accordingly, the ALJ's decision to disregard the evidence from Dr. Miguez because of similar fault was not supported by substantial evidence.

That fact, however, does not end the matter. The SSA argues that any error in the ALJ's similar fault finding is harmless, as the ALJ could have reached the same result by according Dr. Miguez's opinion no weight. The weighing of inconsistent medical evidence is "a function delegated to the administrative law judge, not to the court on judicial review." *Agostini-Cisco v. Comm'r of Soc. Sec.*, 31 F. Supp. 3d 342, 348 (D.P.R. 2014); *see also Irlanda Ortiz*, 955 F.2d at 769. Because the ALJ identified various inconsistencies between Dr. Miguez's opinions and other portions of the record, theoretically, he might have offered Dr. Miguez's opinion no weight. To determine whether any error in the ALJ's similar fault finding was harmless, then, I must ask whether a decision to offer Dr. Miguez's opinion no weight is supported by substantial evidence.

"[T]he responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on ... the ALJ." *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001). "Generally, the more consistent an opinion is with the record as a whole, the more weight [an ALJ] will give to that opinion." 20 C.F.R. § 404.1527(c)(4). "A treating source's opinion on the question of the severity of an impairment will be given controlling weight so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Polanco-Quinones v. Astrue*, 477 F. App'x 745, 746 (1st Cir. 2012) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)).[5]

---

[5] This discussion applies the law relevant to claims filed before March 27, 2017.

"Where controlling weight is not given to a treating source opinion, the ALJ considers an array of factors to determine what weight to grant the opinion[.]" *Bourinot v. Colvin*, 95 F.Supp.3d 161, 175–76 (D. Mass. 2015). Those factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole." *Id.* at 176. *See also* 20 C.F.R. § 404.1527(c)(2)-(6). However, the regulations do not require the ALJ to list these factors or "to expressly state how each factor was considered," as long as the ALJ "provide[s] 'good reasons' for the weight given to a treating source opinion." *Bourinot*, 95 F.Supp.3d at 177 (quoting 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2)).

Dr. Miguez was a treating source who had diagnosed Rivera with "major depressive disorder recurrent of a severe intensity." Tr. 501. He described Rivera's ability to understand and follow instructions as poor; his social interaction as "very poor"; his speech as disorganized; his thought production as fair; his memory, attention, and concentration as limited; and his judgment as impulsive and erratic. Tr. 502-505. He opined that Rivera suffered from severe depression and great anxiety, could not manage stress, could not handle changes in routine, that he needed to be supervised by immediate family members, and that his "social, work, interpersonal, and family performances [we]re severely affected limiting him totally to work." Tr. 502-06. Dr. Miguez concluded that Rivera's prognosis was poor because he had not responded well to treatment and that he did not expect significant changes in the coming years. Tr. 502, 505.

The ALJ gave several reasons for effectively giving this opinion no weight. He concluded that Dr. Miguez's opinion was inconsistent with Rivera's self-reports, that treatment notes failed to corroborate the opinion, and that the opinion conflicted with the findings of a neurological exam.

First, the ALJ stated that Dr. Miguez's opinion regarding Rivera's poor memory and concentration conflicted with Rivera's self-reports, as Rivera had reported that he could handle his own financial affairs, go outside alone, and had no problems with his personal care. This view is not an accurate characterization of Rivera's self-reports. It is true that in a function report dated December 13, 2010, Rivera indicated that he could handle his finances and go out alone. Tr. 342-

43. In that same report, however, Rivera also stated that he needed help with food preparation and household tasks, he needed reminders to help him take the correct amount of medicine, and he needed someone to accompany him to the doctor. Likewise, he could not pay attention for long, finish what he started, follow instructions, manage stress, or handle change in routine. Further, he reported that he no longer enjoyed going out, he had trouble getting along with others, and he felt that everything was difficult. The ALJ made no mention of these portions of the function report, all of which appear consistent with Dr. Miguez's opinion. Additionally, the ALJ made no reference to the August 8, 2011 questionnaire. There, Rivera reported that his wife had to help him with personal care, prepare his meals, give him medication, and manage their finances. He also reported that he performed no household chores, no longer went out shopping, and that others had to drive him and accompany him to places outside his home. Further, he stated that he could not concentrate, handle changes in routine, and suffered from memory problems. Again, these self-reported limitations, which the ALJ did not mention in disregarding evidence from Dr. Miguez, are consistent with Dr. Miguez's opinion.

Next, the ALJ found several problems with Dr. Miguez's treatment notes. He concluded that the notes contained no discussion of mental status, discussed primarily back pain, failed to evidence a thorough mental examination, and included no medical diagnosis. The treatment notes during the relevant period show that Rivera was "very despairing," "forgets things," and struggled to sleep. Tr. 18. He experienced "lack of tranquility," loss of appetite, irritability, and disorientation. *Id.* He was anxious and tense, could not concentrate, and became "unnerved rapidly." *Id.* He looked worried and felt desperate and out of control. *Id.* at 18-19. In light of these notes, it is simply inaccurate to conclude, as the ALJ did, that the notes contained "no discussion of mental status." Tr. 18. Nor is it accurate to conclude, as the ALJ did, that the treatment notes "discuss mostly the beneficiary's back pain." Tr. 19. Of the notes the ALJ considered, seven out of seven refer to Rivera's mental status, while five out of seven also refer to back pain. I see no reason why this fact undermines Dr. Miguez's findings, as common sense suggests that the experience of physical pain might affect one's mental health. Indeed, Rivera himself reported that his physical

pain affected his mental condition. Tr. 345 (reporting that pain affected Rivera's ability to sleep, concentrate, and think).

The ALJ also took issue with the treatment notes because he concluded that they failed to document any thorough mental examination and did not mention a specific medical diagnosis. This asks too much of a physician's treatment notes. "The primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations." *Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007). The treatment notes here document a series of psychiatric appointments, note symptoms, record observations, and track prescriptions. Dr. Miguez completed a more thorough evaluation of Rivera's mental condition in a report dated September 16, 2011. Tr. 501-07. His notes, which exist for his own recordkeeping purposes, need not provide the same level of thoroughness. On the whole, they paint a picture of a patient experiencing stress, anxiety, despair, and insomnia and who, despite treatment, had not seen improvement. They are thus consistent with the opinions Dr. Miguez offered in the mental condition report.

Finally, the ALJ noted that Dr. Miguez's findings were inconsistent with observations recorded in a neurological exam. On March 7, 2011, Dr. Cases conducted a consultative examination in response to an SSA referral requesting an opinion on Rivera's physical limitations. *See* Tr. 453, 460. During that exam, Dr. Cases observed that Rivera was alert, cooperative, and well-oriented. Tr. 453. To the degree such observations contradict Dr. Miguez's opinion, that contradiction is far too insignificant to support according Dr. Miguez's opinion no weight. Indeed, the context of Dr. Cases's evaluation is significant. The SSA had asked Dr. Cases to opine regarding Rivera's physical limitations, stating that his chief complaint was back pain, neck pain, and head trauma. Tr. 460. It is thus unsurprising that the majority of Dr. Cases's findings address

Rivera's physical functioning and that he only briefly mentioned Rivera's mental state. It is not clear whether the ALJ considered this context.[6]

Nor did the ALJ discuss the fact that Rivera sought treatment with Dr. Miguez several times over the course of ten months (during the period under review), whereas Rivera's contact with Dr. Cases was quite limited. Nor did he discuss Dr. Cases's and Dr. Miguez's relative specialties and the degree to which a psychiatrist or neurologist might be better able to assess Rivera's mental limitations. But these factors are generally relevant when weighing medical opinions. *See* 20 C.F.R. § 404.1527(c).

To ask the ALJ to have considered these factors, however, seems unfair, as he believed himself to be engaged in a similar fault analysis rather than in a determination regarding how to weigh the evidence. Under these circumstances, I think the better course of action is to remand to permit the ALJ to properly complete a fraud or similar fault determination. Indeed, as the above discussion suggests, I cannot say that any error in that determination was harmless.

Because I remand to require a new fraud or similar fault determination, I do not reach Rivera's arguments regarding the ALJ's RFC finding, as that finding may change if the ALJ credits evidence from Dr. Miguez. Nor do I reach Rivera's procedural challenges.

I express no opinion as to Rivera's eligibility for disability benefits. Nor do I express any opinion as to whether evidence from Dr. Miguez may be disregarded based on fraud or similar fault. In remanding, I simply instruct the SSA to apply the correct law governing fraud or similar fault determinations, specifically, by making a finding as to whether similar fault was committed knowingly.

---

[6] I also note that, on May 25, 2014, Dr. Cases described as "intact" Rivera's orientation to time, place, and person; recent and remote memory; attention span; and concentration. Tr. 546. This report was dated outside the review period. *See* Tr. 72. Were it under consideration, it would not support a decision to disregard Dr. Miguez's opinion entirely. It only makes findings related to concentration and attention and thus does not contradict Dr. Miguez's opinion as it relates to social functioning. At most, it would provide reason to accord partial rather than no weight to Dr. Miguez's opinion.

Rivera v. Commissioner of Social Security, Civil No. 18-1456 (BJM)                    22

**CONCLUSION**

For the foregoing reasons, the Commissioner's decision is **VACATED** and **REMANDED**

for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 3rd day of September, 2020.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge